IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2012

## MICHAEL TERRELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-03773, 08-03774    Paula L. Skahan, Judge**

**No. W2011-00972-CCA-R3-PC  -  Filed January 14, 2013**

The Petitioner, Michael Terrell, appeals as of right from the Shelby County Criminal Court's denial of his petition for post-conviction relief.  On May 28, 2009, the Petitioner pled guilty to attempted first degree murder, especially aggravated robbery, and aggravated robbery, and he received an agreed sentence of seventeen years at 100% in the Department of Correction. The Petitioner challenges the voluntariness of his guilty plea and the performance of trial counsel.  Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Constance Andrielle Wooden Alexander, Memphis, Tennessee, for the appellant, Michael Terrell.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Corliss Shaw, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On June 17, 2008, the Petitioner was charged, in two separate indictments, with attempted first degree murder, especially aggravated robbery, especially aggravated kidnapping, and aggravated robbery.  The Petitioner pled guilty to attempted first degree murder, especially aggravated robbery, and aggravated robbery on May 28, 2009.  The especially aggravated kidnapping charged was dismissed.

Guilty Plea Submission Hearing. At the plea submission hearing, the State summarized the proof that it would have presented had the Petitioner's cases gone to trial:

> [In indictment 08-03773, co-defendant Monica] Washington lured the victim, Darryl White, to an apartment complex on October 24, 2007, at the suggestion or demand of her co-defendant, [the Petitioner]. When Darryl White got there, he was shot by the [Petitioner]. His car was taken. Both Ms. Washington and [the Petitioner] got into his car, and it was found later abandoned in an apartment complex. Ms. Washington was developed as a suspect, brought in. The victim in the matter identified or recognized, rather, the voice and build and physical appearance of the [Petitioner], and actually the victim is related to - I believe he's related to [the Petitioner]. I believe they are cousins. So, identity was not a problem in that case.
>
> And in the other indictment [08-03774] - the aggravated robbery - Ms. Deena Morgan was working as a clerk at Traveler's Inn on Whitten Road. She had gone outside to take a smoke break when two masked gunned assailants approached her, took her back inside, asked her to open the safe. She did that. They were successful in getting cash from the safe totaling less than $500. They left, and fingerprints from the [Petitioner] were lifted from a cash register and matched the Sheriff's Department's R & I records.

Defense counsel stipulated to the facts as presented and asked the court to accept the plea agreement.

The Petitioner testified that he only went to school through the ninth grade and that he lacked a General Equivalency Diploma. The Petitioner also said that he was not under the influence of any alcohol or drugs at the time of the hearing.

The Petitioner confirmed that trial counsel met with him "while in jail" and that an investigator had been appointed in his case, with whom he also met. Trial counsel reviewed the Petitioner's defense with him, discussing that the co-defendant, the Petitioner's girlfriend, was suppose to testify against him at trial and that the attempted murder victim was his cousin, so identity would not be a problem. The Petitioner confirmed that trial counsel told him that he was unlikely to succeed at trial and that, if convicted as charged, he could "die in prison." The Petitioner further agreed that trial counsel advised him to take the State's seventeen-year offer.

Trial counsel then asked the Petitioner if he wanted to accept the offer, and the Petitioner said "[c]razy, man." The trial court asked the Petitioner what part of trial counsel's

questioning was crazy. The Petitioner pulled from his pocket a counter offer written on a piece of paper and stated, "I want to take this." The trial court asked what the piece of paper was, and trial counsel responded that it was a counter offer of fifteen years. Despite indications to the contrary, the Petitioner insisted that trial counsel had not relayed the fifteen-year offer to the State because the Petitioner "ain't give him the paper." When asked if he understood that the State's offer was seventeen years and that plea negotiations had concluded, the Petitioner stated, "Could I go back there? I need to think real quick."

The trial court explained the Petitioner's sentencing exposure, including the applicable sentencing ranges, the possibility of consecutive sentencing, and limited parole eligibility, to the Petitioner, informing him that he faced a potential sentence of eighty-seven years if he was convicted as charged. The trial court asked the Petitioner if he understood that the State was offering seventeen years, and the Petitioner responded in the affirmative. The trial court confirmed with the Petitioner that he had an "absolute right" to reject the offer and proceed to trial. The court asked the Petitioner if he had any questions, and the Petitioner asked, "If I plead - if I take a plea, right, can I get it back?" The judge advised as follows:

> Once you enter a guilty plea, . . . that plea becomes final after thirty days. There are some legal mechanisms that you can file. You can file a motion and ask this court to allow you to withdraw your guilty plea; but it is almost one hundred percent unlikely that I would allow you to withdraw your guilty plea. . . . [I]t is almost an impossibility that would allow you to come back and change your mind and say, "Well, I've changed my mind, I want to take that plea back," because that would interfere with the administration of justice in my courtroom.

The trial court went on to explain the Petitioner's options to him, including filing a petition for post-conviction relief from his guilty plea or his right of a direct appeal following a jury conviction. The Petitioner was then given an opportunity to "think about it," and the proceedings were recessed.

The Petitioner returned to open court and evinced a desire to enter a plea to the seventeen-year offer. He confirmed that he could read and write and that he signed the plea petition. The Petitioner testified that trial counsel had reviewed his constitutional rights with him. The trial court then advised the Petitioner of his right to a jury trial, his right to testify in his defense, his right to subpoena witnesses in his defense, his right to confront and cross-examine the witnesses against him, and his right to an appeal. The Petitioner stated that he understood those rights and that he did not have any questions about those rights.

The Petitioner confirmed his desire to accept the State's seventeen-year offer and plead guilty. The Petitioner affirmed that no one had threatened him or promised him anything in exchange for his plea. The trial court again reviewed the potential sentencing exposure that the Petitioner faced if he proceeded to trial and the consequences of pleading guilty to violent offenses.

The Petitioner further testified that trial counsel had reviewed all discovery materials with him. When asked if he had any witnesses he wanted trial counsel to talk to, the Petitioner responded that trial counsel had talked to those witnesses. The trial court asked the Petitioner if he had any complaints with trial counsel, and the Petitioner replied, "No. [Trial counsel] cool. . . . I ain't got no complaints." The trial court again confirmed with the Petitioner that he could not later withdraw his plea simply because he changed his mind. The trial court then accepted the Petitioner's guilty plea.

Post-Conviction Proceedings. Thereafter, the Petitioner filed a timely petition for post-conviction relief. Counsel was appointed to represent the Petitioner, and an amended petition was filed. The Petitioner claimed that he did not voluntarily plead guilty because the trial court failed to address him "in open court as to whether he entered the guilty pleas voluntarily, knowingly, and understandingly." Specifically, he submitted that his plea was not knowingly entered because he "was under the mistaken assumption that he could 'take his guilty plea back' after it was entered." He argued that due to this "misunderstanding concerning the finality of a guilty plea, and the Petitioner's limited ninth-grade education," the trial court "should have taken more extensive measures to ensure" that the Petitioner's guilty plea was truly made intelligently and knowingly. As a second claim for post-conviction relief, the Petitioner contended that trial counsel was ineffective. As specific grounds of ineffective assistance, the Petitioner alleged that trial counsel failed to "call upon the assistance of several witnesses provided by the Petitioner in his defense, and advised the [Petitioner] to take the guilty plea." He noted that both the victim and the co-defendant "could have been easily impeached" at the Petitioner's trial, that trial counsel did not "call upon character witnesses to testify to the Petitioner's good character," and that "there was also another witness that could have been called . . . on the Petitioner's behalf, to which the trial attorney made the decision to not use this witness." He further asserted that trial counsel failed to meet with him frequently in preparation for trial. Finally, he submitted that trial counsel was ineffective because it was "not clear from the file of the trial attorney if the trial attorney made attempts to speak with any witnesses . . . in order to examine if inconsistent statements were previously made by the State's witnesses."

A hearing was held in the post-conviction court, at which only the Petitioner and trial counsel testified. The Petitioner testified he did "not completely" understand that he "couldn't take [his] guilty plea back when [he] pled guilty." He elaborated, "I was under a

-4-

different kind of understanding. I had my own little understanding, but I was just, I ain't understanding that I couldn't take it back if I tried to pull I [sic] back." The Petitioner said he wanted "to pull the guilty plea back" because he felt like trial counsel "didn't try to do his job."

The Petitioner asserted that trial counsel "took the statement that [the Petitioner] had given him and [trial counsel] felt like he wasn't going to be able to do any better than the seventeen years." The Petitioner claimed, however, that trial counsel "never tried to use [his] statement," as the Petitioner requested. The Petitioner further stated that trial counsel did not "use the witnesses" that he suggested, including the Petitioner's grandfather, mother, sister, and aunt. According to the Petitioner, trial counsel gave his professional opinion to the Petitioner that it was unlikely that he would succeed at trial.

The Petitioner believed that the trial court "should have taken more thorough extensive measures to explain the weight and importance of the guilty plea." This was so because he "dropped out of school in the ninth grade, so . . . [he] wasn't totally understanding the law and the situation." He stated that he understood that, if he successfully obtained post-conviction relief, then he would get a new trial and would face up to eighty-seven years in prison.

On cross-examination, the Petitioner acknowledged that the trial judge reviewed the terms of his guilty plea agreement with him and that he understood "most of what [the trial court] was saying." He specifically recalled the trial court "going over the plea and the numbers and the sentence and whatnot." The Petitioner also remembered that he asked the trial judge "if [he] pled guilty if [he] could take it back," to which the trial judge responded "no." While he understood "[the trial judge] saying no," the Petitioner was not "understanding that [the trial judge] was meaning that [he] couldn't take it back, just because [he] wanted to take it back. Not because [he] felt like that [he] wasn't represented, sufficiently."

The State confirmed with the Petitioner that he could not take the plea solely because he was not "satisfied" and then questioned the Petitioner, "So why are we here?" The Petitioner replied,

> Because, like I said, I came and read the law and I understood that there was a chance that the witnesses upon my case could have been impeached, but [trial counsel] didn't say anything about, well we get to, these [S]tate's witnesses, we may be able to impeach them.

I understood that, my understanding was, he was like, well we can't win this, just because we couldn't win this. I was feeling like he wasn't taken my statement in my favor to try to fight this.

The Petitioner testified that trial counsel "had been negotiating an agreement with the State every since [he] had been indicted and he took over my case." He confirmed that trial counsel had an investigator appointed to work on the Petitioner's case. However, the Petitioner complained that he "very rarely" saw trial counsel, and he believed that, if he was going to trial, he "should see him way more than, maybe, once every few months." The Petitioner opined that he saw the investigator more than he saw trial counsel and that, even when we met with trial counsel, those visits were "not very long." According to the Petitioner, trial counsel did inform him that his co-defendant was going to testify against him at trial, that the victim was going to identify him as the perpetrator, and that he would be permitted to testify if he so chose. Moreover, trial counsel also reviewed the discovery materials with the Petitioner. The Petitioner said this would have been his "first time" proceeding to trial.

The Petitioner stated that he informed trial counsel of his "side of the story," which was that "it was actually just a drug deal went bad." The Petitioner did not make a statement to police. The Petitioner was asked about the list of witnesses he gave to trial counsel; the Petitioner testified that he gave the names of his family members and "a friend guy that [he] knew, kind of well." According to the Petitioner, trial counsel said "nothing" in response to this list of character witnesses. When asked how their testimony would have changed the outcome of trial, the Petitioner responded, "Not changed, but maybe helped on letting them know my character." He acknowledged that he was present on the scene; therefore, these witnesses would have had no effect on the facts presented to the jury about the circumstances of the offenses.

The Petitioner was then asked about his remarks at the guilty plea hearing. The Petitioner testified that he did not remember the trial court asking him if he had any witnesses to be interviewed. The Petitioner confirmed that, in response to the question of whether he had any problems with or complaints about trial counsel, he responded that trial counsel "was an all right guy."

The Petitioner also referenced his mental capacity and noted that he did not receive a mental evaluation. When asked about the specifics of his mental problems, the Petitioner said that, if he had been evaluated, then "they would have got an understanding on how [he] was understanding it and maybe [he] wouldn't have took the plea agreement a year ago, because they would have been able to understand that [he] wasn't understanding what they was trying to say from it anyway." He admitted that the trial court was aware that he only

-6-

had a ninth-grade education and confirmed that he was twenty-nine years old at the time he entered his plea. The Petitioner also acknowledged that he had previously entered a guilty plea in another case but characterized that as "an easy plea."

The Petitioner said that he did talk with trial counsel about making a fifteen-year deal, which offer trial counsel did take to the State, but the State rejected. The Petitioner acknowledged that he asked for "time to think about" the plea agreement at the guilty plea hearing, which request was granted. During the recess, he was able to talk with his mother; he returned and pled guilty.

Trial counsel testified that he did not use the Petitioner's witnesses because

> they were not relevant as far as guilt, or innocence, since the witnesses weren't present at the scene of the crime. And, calling character witnesses would have opened the door, so to speak, for the prosecutor to question them about [the Petitioner's] bad character which included many criminal convictions and one prior conviction for robbery[.]

Trial counsel said that, in his professional opinion, it was in the Petitioner's best interest to accept the guilty plea because he "had no chance of success at trial." Trial counsel noted that the co-defendant was the Petitioner's girlfriend, who was prepared to testify against the Petitioner at trial, and that the attempted murder victim was the Petitioner's cousin, who would identify the Petitioner as the shooter at trial. In the other robbery case, the Petitioner's fingerprints were found at the scene. Trial counsel stated that the Petitioner was facing up to eighty-seven years in prison.

Trial counsel confirmed that he had an investigator appointed to assist with the Petitioner's case. According to trial counsel, the investigator reviewed all of the discovery materials with the Petitioner. She also attempted to speak with the attempted murder victim, but the victim was not very cooperative and would not consent to a formal interview. Trial counsel recalled that he spoke with the attempted murder victim by phone. He was unable to speak with the Petitioner's co-defendant because she was represented by counsel. He spoke with other potential witnesses, but none of them were helpful. Trial counsel confirmed that he "thoroughly explained the consequences of pleading guilty" to the Petitioner.

On cross-examination, trial counsel stated that he had twelve years of criminal trial experience. He stated that he discussed trial strategy with the Petitioner, noting that the Petitioner claimed "it was a drug deal that did not go as planned." Trial counsel testified that "there were issues with which" to impeach the attempted murder victim and the Petitioner's co-defendant, i.e., the victim had a criminal history and the co-defendant was likely to

receive some benefit in exchange for her testimony against the Petitioner. Despite these credibility issues, trial counsel believed that "[t]hose issues would not detract from their other testimony to a point to where jurors would acquit [the Petitioner] of these offenses." Trial counsel stated that he was prepared to proceed to trial even though he "didn't have much of a defense."

Trial counsel was asked about the Petitioner's mental condition and stated that he did not believe the Petitioner needed a mental evaluation. According to trial counsel, the Petitioner was a "very articulate, lucid young man."

Trial counsel stated that he visited the Petitioner "six times in the jail and there were multiple report dates" where he spoke with him. He believed he was adequately keeping the Petitioner informed. According to trial counsel, the initial offer from the State was thirty years.

After hearing the evidence presented, the post-conviction court denied relief by written order filed on March 11, 2011. This appeal followed.

ANALYSIS

On appeal, the Petitioner contends that his plea was not knowingly and voluntarily entered and that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions at trial. Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded

their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

## I. Voluntariness of Plea

The Petitioner generally contends that "[t]he trial court committed a crucial error in its failure to ascertain whether the Petitioner voluntarily, knowingly, and intelligently waived his right to trial when he entered his guilty plea on May 28, 2009." The Petitioner then goes on to cite to testimony from the post-conviction hearing, specifically references to his limited education and "that he did not fully understand 'the law and the situation.'" He argues that "there is no basis to state that the [Petitioner] knowingly entered his guilty plea before the trial judge," noting that "the transcript shows that the Petitioner was reluctant to enter the guilty plea originally because the State of Tennessee did not accept a counter offer of fifteen years[.]" He later submits in his rambling argument "that perhaps, a psychological test or mental evaluation could have been conducted" and that, "due to his limited ninth-grade education, [he] did not understand the consequences of the guilty plea, to the extent of its finality." He concludes that the trial court "should have taken more extensive measures to ensure that the Petitioner's guilty plea was truly made intelligently and knowingly."

When analyzing the voluntariness of a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S .W.2d 337 (Tenn. 1977). See State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our supreme court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea. Pettus, 986 S.W.2d at 542. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

Because the plea must represent a voluntary and intelligent choice among the alternatives available, there are a number of circumstantial factors that should be considered when examining the voluntariness of a guilty plea. Id. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

## II. Ineffective Assistance of Counsel

Specifically, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel (1) "failed to utilize for impeachment purposes the weaknesses

of the State's witnesses"; (2) "failed to adequately prepare for trial by not calling upon the assistance of several witnesses provided by the Petitioner in his defense"; and (3) "advised the [Petitioner] to take the guilty plea."

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance was deficient is not enough; rather, the petitioner must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under Article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the

fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. Hill v. Lockhart, 474 U.S. at 56 (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)).

*III. Post-conviction Court's Rulings*

The post-conviction court determined that the Petitioner's plea was voluntarily made, ruling as follows:

> Without offering any proof that he was not competent to plead guilty, the Petitioner has failed to establish that he did not knowingly and understandingly accept the guilty plea. Furthermore, the Petitioner's allegation that the trial court failed to adequately address him "personally in open court" is without merit where the record reflects a very clear and direct discourse between Judge Lee Coffee and the Petitioner regarding the consequences of the guilty plea. The Petitioner claims that he was under the impression, at various times, that he may be able to withdraw his guilty plea, or "take it back." The Petitioner claims that this misunderstanding should have called for more extensive measures by the trial court to ensure that the Petitioner's guilty plea was truly made knowingly and understandingly. However, the Petitioner agreed at the post-conviction relief hearing that Judge Coffee specifically addressed this mistaken understanding, stating "I told you that you could not change your mind, that you had thirty days, but it would be unlikely that I would set aside your guilty plea, or allow you to withdraw the guilty plea, do you understand that?" Petitioner's allegations that the trial court did not sufficiently inform him of the consequences of the guilty plea, specifically

with regard to his understanding of an ability to withdraw such a plea, does not make a valid attack on the constitutionality of his guilty plea.

(Footnote and citations omitted).

The post-conviction court then addressed the Petitioner's allegations of ineffective assistance of counsel. Regarding trial counsel's "[f]ailure to call upon witnesses provided by the Petitioner," the post-conviction court ruled as follows:

Trial counsel specifically stated that he chose not to use the Petitioner's proposed witnesses because "they were not relevant as far as guilt or innocence." Additionally, trial counsel testified that he felt that it would not be in the Petitioner's best interest to call potential character witnesses because their testimony would "open the door" for the prosecution's use of witness testimony to establish the bad character of a defendant. Trial counsel stated that he felt that, because there were "plenty of instances of bad character" regarding the Petitioner, that the use of such testimony could be very damaging at trial.

Trial counsel's "tactical and strategic choices" will not be second guessed by the court. Accordingly, trial counsel's performance was that of an attorney with ordinary training and skill in the criminal law and within the range of "reasonable professional assistance." Furthermore, this court cannot conclude that trial counsel's representation prejudiced Petitioner, as Petitioner has failed to offer sufficient proof to support this claim for relief.

(Citations omitted).

Discussing trial counsel's advice to accept the guilty plea agreement rather than go to trial, the post-conviction court concluded as follows:

Trial counsel . . . stated that this decision was based on his professional opinion of the Petitioner's chances of success at trial. Trial counsel testified that he was prepared to proceed at trial, but that he had multiple concerns about the amount of time the Petitioner might be sentenced to at trial, and that he communicated those concerns to the Petitioner. Trial counsel further testified that he explained to Petitioner the consequences of accepting the seventeen-year sentence as part of the plea negotiation. It is important to note that at the time trial counsel was appointed to Petitioner's case, the State's offer for a guilty plea was thirty years. Trial counsel's advice that the

-12-

Petitioner accept a seventeen-year sentence, in light of the likelihood that Petitioner could have otherwise received as sentence almost twice as long, does not amount to ineffective assistance of counsel. As previously mentioned, the court does not second guess with twenty-twenty hindsight, the trial tactics utilized in criminal cases. As such, the Petitioner has not proven his allegation by clear and convincing evidence.

(Citation omitted).

The post-conviction court then discussed the Petitioner's mental capacity:

While the petition does not specifically allege the failure of trial counsel to seek a mental evaluation of Petitioner as grounds for relief, this matter was briefly addressed and has relevance to the matter of constitutionality of a plea negotiation. Because a guilty plea must be entered voluntarily, knowingly, and intelligently, when it can be shown that a defendant's mental state fell below competency standards, there may be grounds for relief from that sentence. However, the Petitioner offers no proof upon which to base a finding of incompetency and further, trial counsel specifically stated that there was no indication that his client lacked in the requisite metal faculties to knowingly, voluntarily and intelligently accept the guilty plea.

*IV. Appellate Review*

The post-conviction court did not credit the testimony of the Petitioner at his post-conviction hearing, instead concluding that the Petitioner understood his plea agreement. There was no evidence to suggest that the Petitioner was incapable of understanding the parameters of his sentence agreement or his counsel's advice. The Petitioner only provided bare allegations of mental problems. At the guilty plea hearing, the Petitioner confirmed that he could read and write despite dropping out of high school in the ninth grade. Trial counsel testified at the post-conviction hearing that the Petitioner was articulate and lucid at the time of his plea. Moreover, the Petitioner was familiar with criminal proceedings, having previously entered a guilty plea, albeit one characterized by him as "an easy plea."

Before the Petitioner pled guilty, counsel and the trial court advised him regarding his rights, the charges against him, and the potential sentence he could receive if he proceeded to trial. The Petitioner was told that he would face up to eighty-seven years in prison if convicted as charged. Despite the Petitioner's assertions to the contrary, the record reflects that the trial court thoroughly explained the finality of his plea to him, even allowing the Petitioner a recess to "think about it." As noted by the post-conviction court, the trial judge

specifically addressed the Petitioner's mistaken understanding regarding his ability to withdraw his plea.

The guilty plea transcript reveals that the trial judge carefully reviewed the rights that the Petitioner was waiving and confirms that the Petitioner responded appropriately to questions. Indeed, in his brief, the Petitioner acknowledges that the trial court "took great steps to explain to the Petitioner the significance and consequences of pleading guilty." The Petitioner said that he was not under the influence of any substance at the plea hearing. The Petitioner was also asked if he was being pressured to plead or offered anything in exchange for his plea, to which he answered no. Furthermore, the Petitioner stated that he was satisfied with trial counsel's representation. The trial court outlined the terms of the plea agreement, and the Petitioner acknowledged his signature on the agreement. The record reflects the Petitioner knew and understood the options available to him prior to the entry of his guilty plea, including the right not to plead guilty and continue with his jury trial, and he freely made an informed decision of that course that was most palatable to him at the time.

The Petitioner was also represented by competent counsel. Regarding the Petitioner's allegations that trial counsel "failed to utilize for impeachment purposes the weaknesses of the State's witnesses," trial counsel testified that he was aware of the possibility of impeachment of the attempted murder victim and the co-defendant. However, trial counsel opined that these impeachment prospects were not relevant to the Petitioner's guilt or innocence and would not result in an acquittal for the Petitioner.

The Petitioner's assertion that trial counsel was constitutionally ineffective for failing to interview the witnesses he provided is unsupported. At the guilty plea hearing, the Petitioner was asked if he had any witnesses he wanted trial counsel to talk to, and the Petitioner responded that trial counsel had talked with those witnesses. Additionally, the Petitioner did not present any of these witnesses at the post-conviction hearing.

> When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that . . . the failure to discover or interview a witness inured to his prejudice.

Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Furthermore, the Petitioner acknowledged that these witnesses were only character witnesses and could offer little information on the facts surrounding these offenses. Trial counsel testified that calling these witnesses would "open the door" for the State to put on

evidence of the Petitioner's prior criminal history. We agree with the post-conviction court that counsel's decision not to use these witnesses represented sound defense strategy.

The Petitioner also contends that trial counsel was ineffective for advising him to plead guilty. However, the evidence presented at the evidentiary hearing reflects that trial counsel thoroughly and adequately investigated the Petitioner's case before advising him regarding the plea agreement. Trial counsel said that he reviewed the facts of the case with the Petitioner, including possible defense strategies, his right to testify on his own behalf, the penalties he was facing, and the possibility of proceeding to trial. Trial counsel had an investigator appointed to assist in the Petitioner's case. The Petitioner testified that trial counsel reviewed all discovery materials with him. Trial counsel said that he met with the Petitioner on multiple occasions. Trial counsel believed that the Petitioner's chances at trial were not favorable. The Petitioner has failed to show that he was denied the effective assistance of counsel.

The evidence supports the findings of fact and conclusions of law made by the post-conviction court. Accordingly, we conclude that the post-conviction court did not err in finding that the Petitioner voluntarily, knowingly, and intelligently pled guilty and that counsel was not deficient.

<u>CONCLUSION</u>

Based upon the foregoing, we conclude that the post-conviction court did not err by denying post-conviction relief. Accordingly, we affirm the judgment of the Shelby County Criminal Court.

_____
D. KELLY THOMAS, JR., JUDGE